Daniel Sadeh, Esq.
**HALPER SADEH LLP**
667 Madison Avenue, 5th Floor
New York, NY 10065
Telephone: (212) 763-0060
Facsimile: (646) 776-2600
Email: sadeh@halpersadeh.com

*Counsel for Plaintiff*

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| MICHAEL CARROLL,<br><br>Plaintiff,<br><br>v.<br><br>FIVE PRIME THERAPEUTICS, INC., WILLIAM R. RINGO, FRANKLIN M. BERGER, KAPIL DHINGRA, PEDER K. JENSEN, GARRY NICHOLSON, CAROL SCHAFER, LORI LYONS-WILLIAMS, and THOMAS CIVIK,<br><br>Defendants. | Case No:<br><br>JURY TRIAL DEMANDED |

**COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**

Plaintiff Michael Carroll ("Plaintiff"), by Plaintiff's undersigned attorneys, for Plaintiff's complaint against Defendants (defined below), alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and upon information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys.

**NATURE OF THE ACTION**

1. This is an action against Five Prime Therapeutics, Inc. ("Five Prime" or the "Company") and its Board of Directors (the "Board" or the "Individual Defendants") for their violations of Sections 14(e), 14(d)(4), and 20(a) of the Securities Exchange Act of 1934 (the

"Exchange Act"), 15 U.S.C. §§ 78n(e), 78n(d)(4), and 78t(a), and Rule 14d-9 promulgated thereunder by the SEC, 17 C.F.R. § 240.14d-9, in connection with the proposed acquisition (the "Proposed Transaction") of Five Prime by Amgen Inc. ("Amgen") and its wholly-owned subsidiary, Franklin Acquisition Sub, Inc. ("Purchaser").

**JURISDICTION AND VENUE**

2. The claims asserted herein arise under and pursuant to Sections 14(e), 14(d)(4), and 20(a) of the Exchange Act (15 U.S.C. §§ 78n(e), 78n(d)(4), and 78t(a)) and Rule 14d-9 promulgated thereunder by the SEC (17 C.F.R. § 240.14d-9).

3. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

4. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)) as a substantial portion of the transactions and wrongs complained of herein had an effect in this District, the alleged misstatements entered and the subsequent damages occurred in this District, and the Company conducts business in New York.[1]

5. In connection with the acts, conduct and other wrongs alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mails, interstate telephone communications and the facilities of the national securities exchange.

**PARTIES**

6. Plaintiff is, and has been at all relevant times hereto, an owner of Five Prime common stock.

---

[1] For example, the Company reportedly participated in various conferences in New York City throughout the years.

7. Defendant Five Prime is a clinical-stage biotechnology company that focuses on the discovery and development of innovative protein therapeutics. The Company is incorporated in Delaware. The Company's common stock trades on the Nasdaq Global Select Market under the ticker symbol, "FPRX."

8. Defendant William R. Ringo ("Ringo") is Chairman of the Board of the Company. Defendant Ringo served as interim Chief Executive Officer ("CEO") of the Company from September 2019 to April 2020.

9. Defendant Franklin M. Berger ("Berger") is a director of the Company.

10. Defendant Kapil Dhingra ("Dhingra") is a director of the Company.

11. Defendant Peder K. Jensen ("Jensen") is a director of the Company.

12. Defendant Garry Nicholson ("Nicholson") is a director of the Company.

13. Defendant Carol Schafer ("Schafer") is a director of the Company.

14. Defendant Lori Lyons-Williams ("Lyons-Williams") is a director of the Company.

15. Defendant Thomas Civik ("Civik") is President, CEO, and a director of the Company.

16. Defendants Ringo, Berger, Dhingra, Jensen, Nicholson, Schafer, Lyons-Williams, and Civik are collectively referred to herein as the "Individual Defendants."

17. Defendants Five Prime and the Individual Defendants are collectively referred to herein as the "Defendants."

## SUBSTANTIVE ALLEGATIONS

### A. The Proposed Transaction

18. On March 4, 2021, Five Prime and Amgen announced that they had entered into a merger agreement whereby Amgen would acquire Five Prime for $38.00 per share in cash. The

press release announcing the Proposed Transaction states, in pertinent part:

> **Amgen To Acquire Five Prime Therapeutics For $1.9 Billion in Cash**
>
> Acquisition Includes Bemarituzumab, A Phase 3 Ready, First-In-Class Program For Gastric Cancer, the Third Leading Cause of Cancer Mortality Worldwide
>
> Bemarituzumab is a Strong Strategic Fit With Amgen's Innovative Oncology Portfolio
>
> Amgen to Host Investor Call at 10:30 a.m. EST
>
> THOUSAND OAKS, Calif. And SOUTH SAN FRANCISCO, Calif., March 4, 2021 /PRNewswire/ -- Amgen (NASDAQ: AMGN) and Five Prime Therapeutics (NASDAQ: FPRX), a clinical-stage biotechnology company focused on developing immuno-oncology and targeted cancer therapies, today announced an agreement under which Amgen will acquire Five Prime Therapeutics for $38.00 per share in cash, representing an equity value of approximately $1.9 billion. This acquisition adds Five Prime's innovative pipeline to Amgen's leading oncology portfolio.
>
> - Five Prime's lead asset, bemarituzumab, is a first-in-class, Phase 3 ready anti-FGFR2b antibody with positive data from a randomized, placebo-controlled Phase 2 study in frontline advanced gastric or gastroesophageal junction (GEJ) cancer. Bemarituzumab targets FGFR2b, which has been found to be overexpressed in approximately 30% of patients with non-HER2 positive gastric cancer, as well as other solid tumors.
> - The bemarituzumab Phase 2 FIGHT trial demonstrated clinically meaningful improvements in progression-free survival (PFS), overall survival (OS) and overall response rate (ORR) in the frontline treatment of patients with advanced gastric or GEJ cancer. Additional analysis showed a positive correlation between efficacy and expression of FGFR2b on tumor cells, confirming both the importance of the FGFR2b target and the activity of bemarituzumab against this target.
> - This correlation suggests that FGFR2b could play a role in other epithelial cancers, including lung, breast, ovarian and other cancers.
> - The acquisition of Five Prime also supports Amgen's international expansion strategy. Gastric cancer is one of the world's most common forms of cancer and is particularly prevalent in the Asia-Pacific region, where Amgen expects to generate significant volume growth in the coming years. Amgen plans to leverage its presence in Japan and other Asia-Pacific markets to maximize bemarituzumab's potential. In addition, as part of this transaction, Amgen will receive a royalty percentage on future net sales in Greater China ranging from the high teens to the low twenties from a pre-existing co-development and commercialization agreement between Five Prime and Zai Lab (Shanghai) Co., Ltd.

- Five Prime's additional innovative pipeline programs complement Amgen's efforts to bring meaningful therapies to oncology patients.

"The acquisition of Five Prime offers a compelling opportunity for Amgen to strengthen our oncology portfolio with a promising late-stage, first-in-class global asset to treat gastric cancer," said Robert A. Bradway, chairman and chief executive officer at Amgen. "We look forward to welcoming the Five Prime team to Amgen and working with them to leverage our best-in-class monoclonal antibody manufacturing capabilities to supply additional clinical materials, as well as expanded production quantities, to realize the full potential of bemarituzumab for even more patients around the world as quickly as possible."

"This is an exciting day for patients who may one day benefit from the promise of bemaritizumab and our full pipeline. I'm so proud of the Five Prime team and the science we've pioneered," said Tom Civik, president and chief executive officer of Five Prime. "We see tremendous complementarity between the two companies. Amgen has global reach, world-class resources, and they share our deep passion for science and commitment to patients. I have full confidence that Amgen is the right company to work with us to bring our innovative cancer treatments to patients and to achieve our mission to rewrite cancer."

**Transaction Terms**
Under the terms of the merger agreement, which was approved by the Boards of Directors of both companies, Amgen will commence a tender offer to acquire all of the outstanding shares of Five Prime's common stock for $38.00 per share in cash. Following the completion of the tender offer, a wholly-owned subsidiary of Amgen will merge with Five Prime and shares of Five Prime that have not been tendered and purchased in the tender offer will be converted into the right to receive the same price per share in cash as paid in the tender offer (other than shares held by stockholders who properly demand and perfect appraisal rights under Delaware law).

The transaction is expected to close by the end of the second quarter and is subject to customary closing conditions, including the tender of at least a majority of the outstanding shares of Five Prime's common stock and the expiration or termination of the waiting period under the Hart-Scott-Rodino Antitrust Improvements Act of 1976.

Amgen reaffirmed its full-year outlook with Revenue guidance of $25.8 to $26.6 billion and non-GAAP EPS guidance of $16.00-$17.00.

Goldman Sachs acted as financial advisor to Amgen and Sullivan & Cromwell LLP as its legal advisor. Lazard acted as financial advisor to Five Prime and Cooley LLP as its legal advisor.

* * *

**About FGFR2b**

The fibroblast growth factor (FGF)/fibroblast growth factor receptor (FGFR) pathway is implicated in the development and growth of cancer cells. FGFR2b is a splice variant of FGFR2 which can be found in tumors of epithelial origin. Data from the FIGHT trial suggests that approximately 30 percent of patients with non-HER2 positive gastroesophageal cancers overexpress FGFR2b.[1] FGFR2b has also been shown to be overexpressed in numerous other cancers, including lung, breast, ovarian and other cancers.

**About Bemarituzumab**

Bemarituzumab (anti-FGFR2b) is a first-in-class targeted antibody that blocks fibroblast growth factors (FGFs) from binding and activating FGFR2b, inhibiting several downstream pro-tumor signaling pathways and potentially slowing cancer progression. Five Prime Therapeutics granted an exclusive license to Zai Lab Limited to develop and commercialize bemarituzumab in Greater China, and Zai Lab collaborated with Five Prime Therapeutics on the Phase 2 FIGHT trial in Greater China.

**About the FIGHT Trial**

The FIGHT study was a randomized, placebo controlled trial that evaluated bemarituzumab plus chemotherapy (mFOLFOX6) versus placebo plus chemotherapy in patients with fibroblast growth factor receptor 2b-positive (FGFR2b+), non HER2 positive frontline advanced gastric or GEJ cancer. The trial enrolled 155 patients in 15 countries across Asia, the European Union, and the United States, with 77 patients randomized to the bemarituzumab arm and 78 patients to the placebo arm.

**About Gastric Cancer and GEJ Cancer**

Gastric cancer, also known as stomach cancer, is the third most common cause of cancer death worldwide and, excluding non-melanoma skin cancer, the fifth most common cancer worldwide, with over 1,000,000 new cases diagnosed each year.[2] For HER2 negative patients, frontline therapy available today is the same systemic chemotherapy available since the 1990s.[3,4]

**About Five Prime Therapeutics**

Five Prime Therapeutics is a clinical stage biotechnology company relentlessly focused on rewriting cancer. By tackling the tough scientific questions and untapped pathways, we aim to offer new hope by developing novel, breakthrough therapies that have potential to alter the course of disease in cancers with few treatment options. This vision is what defines us and guides our research, clinical development and partnerships. To build a better tomorrow for people with cancer, we are teaming up with patients, physicians, scientists, and industry partners to make a meaningful difference in patients' lives. Five Prime collaborates with leading global pharmaceutical companies and has therapies in pre-clinical and clinical development.

**About Amgen Oncology**
Amgen Oncology is searching for and finding answers to incredibly complex questions that will advance care and improve lives for cancer patients and their families. Our research drives us to understand the disease in the context of the patient's life – not just their cancer journey – so they can take control of their lives.

For the last four decades, we have been dedicated to discovering the firsts that matter in oncology and to finding ways to reduce the burden of cancer. Building on our heritage, Amgen continues to advance the largest pipeline in our history, moving with great speed to advance those innovations for the patients who need them.

At Amgen, we are driven by our commitment to transform the lives of cancer patients and keep them at the center of everything we do.

To learn more about Amgen's innovative pipeline with diverse modalities and genetically validated targets, please visit AmgenOncology.com. For more information, follow us on www.twitter.com/amgenoncology.

**About Amgen**
Amgen is committed to unlocking the potential of biology for patients suffering from serious illnesses by discovering, developing, manufacturing and delivering innovative human therapeutics. This approach begins by using tools like advanced human genetics to unravel the complexities of disease and understand the fundamentals of human biology.

Amgen focuses on areas of high unmet medical need and leverages its expertise to strive for solutions that improve health outcomes and dramatically improve people's lives. A biotechnology pioneer since 1980, Amgen has grown to be one of the world's leading independent biotechnology companies, has reached millions of patients around the world and is developing a pipeline of medicines with breakaway potential.

For more information, visit www.amgen.com and follow us on www.twitter.com/amgen.

19. On March 18, 2021, the Company filed a Schedule 14D-9 Solicitation/Recommendation Statement under Section 14(d)(4) of the Exchange Act (the "Solicitation Statement") with the SEC in connection with the Proposed Transaction.

**B. The Solicitation Statement Contains Materially False and Misleading Statements and Omissions**

20. The Solicitation Statement, which recommends that Five Prime shareholders tender

their shares to Purchaser in connection with the Proposed Transaction, omits and/or misrepresents material information concerning: (i) the Company's financial projections; (ii) the financial analyses performed by the Company's financial advisor, Lazard Frères & Co. LLC ("Lazard"), in connection with its fairness opinion; and (iii) potential conflicts of interest involving Lazard.

21. The omission of the material information (referenced below) renders the following sections of the Solicitation Statement false and misleading, among others: (i) Recommendation of the Five Prime Board; (ii) The Five Prime Board's Reasons for the Offer and the Merger; (iii) Opinion of the Five Prime's Financial Advisor; and (iv) Projected Financial Information.

22. The tender offer in connection with the Proposed Transaction is set to expire at midnight, New York time on April 16, 2021 (the "Expiration Date"). It is imperative that the material information that was omitted from the Solicitation Statement be disclosed to the Company's shareholders prior to the Expiration Date to enable them to make an informed decision as to whether to tender their shares. Plaintiff may seek to enjoin Defendants from closing the tender offer or the Proposed Transaction unless and until the material misstatements and omissions (referenced below) are remedied. In the event the Proposed Transaction is consummated, Plaintiff may seek to recover damages resulting from Defendants' misconduct.

**1. Material Omissions Concerning the Company's Financial Projections**

23. The Solicitation Statement omits material information concerning the Company's financial projections.

24. The Solicitation Statement states that the Company's management prepared certain non-public, risk-adjusted prospective financial information for calendar years 2021 through 2045 which was approved in February 2021 for use by the Board and provided to Lazard for use in its financial analyses and opinion (the "Five Prime Management Projections"). The Five Prime Management Projections were "risk-adjusted to reflect Five Prime's management's estimate

of the probability of technical, commercial and regulatory success for the Company's pipeline products."

25. The Solicitation Statement, however, fails to disclose and quantify the impact of the risk adjustments on the Five Prime Management Projections, including management's estimate of the probability of technical, commercial and regulatory success for the Company's pipeline products. The Solicitation Statement fails to disclose and quantify how this information affected the Five Prime Management Projections.

26. With respect to the Five Prime Management Projections, the Solicitation Statement fails to disclose: (1) all line items underlying: (i) Total Revenue, (ii) Gross Profit, (iii) EBIT, and (iv) Unlevered Free Cash Flow; (2) the Company's net income projections; and (3) a reconciliation of all non-GAAP to GAAP metrics.

27. The disclosure of this information is material because it would provide the Company's shareholders with a basis to project the future financial performance of the Company and would allow shareholders to better understand the financial analyses performed by the Company's financial advisor in support of its fairness opinion. Shareholders cannot hope to replicate management's inside view of the future prospects of the Company. Without such information, which is uniquely possessed by Defendant(s) and the Company's financial advisor, the Company's shareholders are unable to determine how much weight, if any, to place on the Company's financial advisor's fairness opinion in determining whether to tender their shares in connection with the Proposed Transaction.

28. When a company discloses non-GAAP financial metrics in a Solicitation Statement that were relied upon by its board of directors in recommending that shareholders exercise their corporate suffrage rights in a particular manner, the company must also disclose, pursuant to SEC

Regulation G, all projections and information necessary to make the non-GAAP metrics not misleading, and must provide a reconciliation (by schedule or other clearly understandable method) of the differences between the non-GAAP financial metrics disclosed or released with the most comparable financial metrics calculated and presented in accordance with GAAP. 17 C.F.R. § 244.100.[2]

29. The above-referenced omitted information, if disclosed, would significantly alter the total mix of information available to the Company's shareholders.

**2. Material Omissions Concerning Lazard's Analyses**

30. In connection with the Proposed Transaction, the Solicitation Statement omits material information concerning analyses performed by Lazard.

31. With respect to Lazard's "*Selected Public Companies Analysis*," the Solicitation Statement fails to disclose the individual multiples and metrics of the companies observed by Lazard in its analyses.

32. With respect to Lazard's "*Selected Precedent Transactions Analysis*," the Solicitation Statement fails to disclose the individual multiples and metrics, as well as the total transaction values, for the transactions observed by Lazard in its analyses.

33. The Solicitation Statement fails to disclose the following concerning Lazard's "*Discounted Cash Flow Analysis*": (1) all line items used to calculate unlevered free cash flow;

[2] Mary Jo White, *Keynote Address, International Corporate Governance Network Annual Conference: Focusing the Lens of Disclosure to Set the Path Forward on Board Diversity, Non-GAAP, and Sustainability* (June 27, 2016), https://www.sec.gov/news/speech/chair-white-icgn-speech.html (footnotes omitted) (last visited Mar. 23, 2021) ("And last month, the staff issued guidance addressing a number of troublesome practices which can make non-GAAP disclosures misleading: the lack of equal or greater prominence for GAAP measures; exclusion of normal, recurring cash operating expenses; individually tailored non-GAAP revenues; lack of consistency; cherry-picking; and the use of cash per share data. I strongly urge companies to carefully consider this guidance and revisit their approach to non-GAAP disclosures.").

(2) the individual inputs and assumptions underlying the (i) discount rates ranging from 10.0% to 12.0%, and (ii) terminal growth rates ranging from (50%) – (10%) and, in particular, the decision to use such a large negative terminal growth rate; (3) the terminal values of the Company; and (4) the number of fully diluted shares outstanding of the Company as of March 2, 2021.

34. With respect to Lazard's "*Premia Paid Analysis*," the Solicitation Statement fails to disclose each transaction and the premiums paid therein.

35. With respect to Lazard's "*Research Analyst Price Targets*" analysis, the Solicitation Statement fails to disclose: (1) the individual price targets observed by Lazard in its analyses; and (2) the sources thereof.

36. The valuation methods, underlying assumptions, and key inputs used by Lazard in rendering its purported fairness opinion must be fairly disclosed to the Company's shareholders. The description of Lazard's fairness opinion and analyses, however, fails to include key inputs and assumptions underlying those analyses. Without the information described above, the Company's shareholders are unable to fully understand Lazard's fairness opinion and analyses, and are thus unable to determine how much weight, if any, to place on them in determining whether to tender their shares in connection with the Proposed Transaction. This omitted information, if disclosed, would significantly alter the total mix of information available to the Company's shareholders.

**3. Material Omissions Concerning Potential Conflicts of Interest Involving Lazard**

37. The Solicitation Statement omits material information concerning potential conflicts of interest involving Lazard.

38. The Solicitation Statement summarily provides that "Lazard has in the past two years provided certain investment banking services to Five Prime."

39. The Solicitation Statement, however, fails to disclose the amount of compensation

Lazard received or expects to receive in connection with providing such services to Five Prime.

40. Further, the Solicitation Statement fails to disclose whether Lazard has performed past services for Amgen and its affiliates during the past two years, and, if so, the timing and nature of such services, including the amount of compensation Lazard received for providing each service.

41. Disclosure of a financial advisor's compensation and potential conflicts of interest to shareholders is required due to their central role in the evaluation, exploration, selection, and implementation of strategic alternatives and the rendering of any fairness opinions. Disclosure of a financial advisor's potential conflicts of interest may inform shareholders on how much weight to place on that analysis.

42. The above-referenced omitted information, if disclosed, would significantly alter the total mix of information available to the Company's shareholders.

**COUNT I**

**For Violations of Section 14(e) of the Exchange Act**

**Against All Defendants**

43. Plaintiff repeats and re-alleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

44. Section 14(e) of the Exchange Act states, in relevant part:

> It shall be unlawful for any person to make any untrue statement of a material fact or omit to state any material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading . . . in connection with any tender offer or request or invitation for tenders[.]

45. During the relevant period, Defendants, individually and in concert, directly or indirectly, disseminated or approved the false and misleading Solicitation Statement specified above, which failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, in violation of Section

14(e) of the Exchange Act.

46. Each of the Individual Defendants, by virtue of their positions within the Company as officers and/or directors, were aware of materially false and/or misleading and/or omitted information but failed to disclose such information, in violation of Section 14(e) of the Exchange Act. Defendants, by use of the mails and means and instrumentalities of interstate commerce, solicited and/or permitted the use of their names to file and disseminate the Solicitation Statement with respect to the Proposed Transaction.

47. The false and misleading statements and omissions in the Solicitation Statement are material in that a reasonable shareholder would consider them important in deciding whether to tender their shares in connection with the Proposed Transaction.

48. Defendants acted knowingly or with deliberate recklessness in filing or causing the filing of the materially false and misleading Solicitation Statement.

49. By reason of the foregoing, Defendants violated Section 14(e) of the Exchange Act.

50. Because of the false and misleading statements in the Solicitation Statement, Plaintiff is threatened with irreparable harm.

**COUNT II**

**For Violations of Section 14(d)(4) of the Exchange Act and Rule 14d-9 Promulgated Thereunder**

**Against All Defendants**

51. Plaintiff repeats and re-alleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

52. Defendants caused the Solicitation Statement to be issued with the intent to solicit shareholder support for the Proposed Transaction.

53. Section 14(d)(4) of the Exchange Act and SEC Rule 14d-9 promulgated thereunder require full and complete disclosure in connection with tender offers. Specifically, Section

14(d)(4) states, in relevant part:

> Any solicitation or recommendation to the holders of such a security to accept or reject a tender offer or request or invitation for tenders shall be made in accordance with such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

54. SEC Rule 14d-9(d), adopted to implement Section 14(d)(4) of the Exchange Act, states, in relevant part:

> Any solicitation or recommendation to holders of a class of securities referred to in section 14(d)(1) of the Act with respect to a tender offer for such securities shall include the name of the person making such solicitation or recommendation and the information required by Items 1 through 8 of Schedule 14D-9 (§ 240.14d-101) or a fair and adequate summary thereof[.]

55. In accordance with SEC Rule 14d-9, Item 8 of Schedule 14D-9 requires that a company:

> Furnish such additional material information, if any, as may be necessary to make the required statements, in light of the circumstances under which they are made, not materially misleading.

56. During the relevant period, Defendants, individually and in concert, directly or indirectly, disseminated or approved the false and misleading Solicitation Statement specified above, which failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, in violation of Section 14(d)(4) of the Exchange Act and SEC Rule 14d-9.

57. Each of the Individual Defendants, by virtue of their positions within the Company as officers and/or directors, were aware of materially false and/or misleading and/or omitted information but failed to disclose such information, in violation of Section 14(d)(4) of the Exchange Act and SEC Rule 14d-9. Defendants, by use of the mails and means and instrumentalities of interstate commerce, solicited and/or permitted the use of their names to file and disseminate the Solicitation Statement with respect to the Proposed Transaction.

58. Defendants acted knowingly or with deliberate recklessness in filing the materially false and misleading Solicitation Statement which omitted material information.

59. The false and misleading statements and omissions in the Solicitation Statement are material in that a reasonable shareholder would consider them important in deciding whether to tender their shares in connection with the Proposed Transaction.

**COUNT III**
**Violations of Section 20(a) of the Exchange Act**
**Against the Individual Defendants**

60. Plaintiff repeats and re-alleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

61. The Individual Defendants acted as control persons of the Company within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their senior positions as officers and/or directors of the Company and participation in and/or awareness of the Company's operations and/or intimate knowledge of the false statements contained in the Solicitation Statement filed with the SEC, they had the power to and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the false and misleading Solicitation Statement.

62. Each of the Individual Defendants was provided with or had unlimited access to copies of the Solicitation Statement and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected. As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to the Solicitation Statement, and to correct promptly any public statements issued by the Company which were or had become materially false or misleading.

63. In particular, each of the Individual Defendants had direct and supervisory involvement in the operations of the Company, and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same. The Individual Defendants were provided with or had unlimited access to copies of the Solicitation Statement and had the ability to prevent the issuance of the statements or to cause the statements to be corrected. The Solicitation Statement at issue contains the recommendation of the Individual Defendants to tender their shares pursuant to the Proposed Transaction. Thus, the Individual Defendants were directly involved in the making of the Solicitation Statement.

64. In addition, as the Solicitation Statement sets forth at length, and as described herein, the Individual Defendants were involved in negotiating, reviewing, and approving the Proposed Transaction. The Solicitation Statement purports to describe the various issues and information that they reviewed and considered—descriptions which had input from the Individual Defendants.

65. By virtue of the foregoing, the Individual Defendants have violated Section 20(a) of the Exchange Act.

66. As set forth above, the Individual Defendants had the ability to exercise control over and did control a person or persons who have each violated Sections 14(e), 14(d)(4), and Rule 14d-9 promulgated thereunder, by their acts and omissions as alleged herein. By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Defendants' conduct, the Company's shareholders will be irreparably harmed.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for judgment and relief as follows:

A. Preliminarily and permanently enjoining Defendants and all persons acting in concert with them from proceeding with, consummating, or closing the Proposed Transaction and the tender offer in connection with the Proposed Transaction, unless and until Defendants disclose and disseminate the material information identified above to the Company's shareholders;

B. In the event Defendants consummate the Proposed Transaction, rescinding it and setting it aside or awarding Plaintiff rescissory damages;

C. Declaring that Defendants violated Sections 14(e), 14(d)(4), and 20(a) of the Exchange Act, and Rule 14d-9 promulgated thereunder;

D. Awarding Plaintiff reasonable costs and expenses incurred in this action, including counsel fees and expenses and expert fees; and

E. Granting such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated: March 23, 2021

Respectfully submitted,

**HALPER SADEH LLP**

By: /s/ Daniel Sadeh
Daniel Sadeh, Esq.
Zachary Halper, Esq. (to be admitted *pro hac vice*)
667 Madison Avenue, 5th Floor
New York, NY 10065
Telephone: (212) 763-0060
Facsimile: (646) 776-2600
Email: sadeh@halpersadeh.com
zhalper@halpersadeh.com

*Counsel for Plaintiff*